# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 21
Lujerio Cordero,
  Appellant,
  v.
Transamerica Annuity Service
Corporation, &c.,
  Respondent,
Transamerica Life Insurance
Company,
  Respondent,
et al.,
 Third-Party Defendants-
  Cross Defendants.

Scott A. Eisman, for appellant.
John Neman, for respondents.
National Structured Settlements Trade Association, amicus curiae.

TROUTMAN, J.:

  The United States Court of Appeals for the Eleventh Circuit certified to this Court

a question requiring us to consider whether a plaintiff sufficiently pleads a cause of action

for breach of the implied covenant of good faith and fair dealing under New York law by

alleging that, during a Structured Settlement Protection Act proceeding, defendants (i.e., the structured settlement obligor and the issuer of an annuity funding the settlement) failed to enforce the anti-assignment provisions contained in structured settlement and qualified assignment agreements. Based on our reformulation of the question, we conclude that such allegations do not state a cognizable cause of action for breach of the implied covenant.

I.

Plaintiff Lujerio Cordero suffered lead poisoning as a child from paint in his apartment building, which "resulted in debilitating and permeant health issues, including permanent cognitive impairment" (*Cordero v Transamerica Annuity Serv. Corp.*, 34 F4th 994, 997 [11th Cir 2022]). In 1996, Cordero, then five years old and acting through his mother as guardian, entered into a structured settlement agreement (Settlement Agreement) with his landlord's insurer. The Settlement Agreement contained a New York choice-of-law clause.

The parties structured the Settlement Agreement to comply with the Periodic Payment Settlement Act of 1982 (PPSA), which provides, among other things, that periodic structured settlement payments to tort victims are not subject to federal income tax (*see* Internal Revenue Code [26 USC] § 130). One aim of the PPSA is to help ensure that tort victims, particularly minors, do not squander their settlement proceeds (*see* Karen Syma Czapanskiy, *Structured Settlement Sales and Lead-Poisoned Sellers: Just Say No,* 36 Va Envtl LJ 1, 8 n 35 [2017] ["Favorable tax treatment of structured settlements is thought to encourage provident use of tort damage awards by people who might use a lump sum award unwisely, forfeit financial security and risk becoming dependent on public benefits such as

Medicaid or Supplemental Security Income"]; 145 Cong. Rec. S5281-01 [Statement of Sen. Chafee] ["Congress has adopted special tax rules to encourage and govern the use of structured settlements in physical injury cases [and] shield victims and their families from pressures to prematurely dissipate their recoveries"]). In furtherance of these aims, the PPSA provides that periodic payments "cannot be accelerated, deferred, increased, or decreased by the recipient of such payments" (26 USC § 130 [c] [2] [B]; *see e.g.* Daniel W. Hindert, Joseph J. Dehner & Patrick J. Hilbert, Structured Settlement and Periodic Payment Judgments § 16.02 [1] [c] [2022]).

The Settlement Agreement provided that the landlord and his insurer "agree[] to pay and to make periodic payments" to Cordero, beginning at age 18, in the monthly amount of $3,183.94 for a period of 30 years. The payments were to "be provided for and secured by an annuity contract" issued by defendant Transamerica Life Insurance Company (Transamerica Life). The parties further agreed that the landlord or his insurer would make a "Qualified Assignment" to Transamerica Annuity Service Corporation (Transamerica Annuity) of the obligation to make periodic payments to Cordero.[1] Transamerica Annuity would then "fund the periodic payments by purchasing a 'qualified funding asset' within the meaning of Section 130 (d) of the Internal Revenue Code in the form of [the] annuity issued by [Transamerica Life]," making Transamerica Life the issuer of the annuity (issuer) and Transamerica Annuity both the structured settlement obligor and the legal owner of the annuity (obligor).

---

[1] Transamerica Annuity is now known as Wilton Re Annuity Service Corporation.

The parties executed the Qualified Assignment the same day as the Settlement Agreement, assigning to defendant Transamerica Annuity the obligation to make the periodic payments to Cordero. Transamerica Annuity in turn purchased an annuity from Transamerica Life that generated a periodic payment stream that matched Transamerica Annuity's payment obligation. Under the Qualified Assignment, Transamerica Annuity "assume[d] all of the . . . liability" of the landlord's insurer to make the periodic payments to Cordero. However, Transamerica Annuity's "liability to make the [p]eriodic [p]ayments is no greater than that of the [the landlord's insurer] immediately preceding [the] [a]greement." The Qualified Assignment further provides that Cordero has "no rights against [Transamerica Annuity] greater than a general creditor," and Transamerica Annuity is not "required to set aside specific assets to secure the [p]eriodic [p]ayments."

Both the Settlement Agreement and the Qualified Assignment include provisions that prohibit assignment. In the Settlement Agreement, a section titled "Payee's Rights to Periodic Payments" states that plaintiff shall not "have the power to sell, mortgage, encumber or anticipate same, or any part thereof, by assignment or otherwise." The Qualified Assignment provides that "[n]one of the Periodic Payments" to Cordero "may be . . . sold, assigned or encumbered."[2]

---

[2] The Settlement Agreement and Qualified Assignment did not include information about Cordero's mental capacity. Furthermore, the annuity contract did not restrict assignment. Although Cordero's projected lifespan was used to set the measuring life of the annuity, the agreement provides (1) that "an assignment of this policy will not be binding upon the [issuer] until recorded at its Home Office" and (2) that the issuer "assumes no responsibility for the sufficiency or validity of any assignment."

Despite those provisions, Cordero transferred his rights to the periodic payments to various entities known as factoring companies. Those companies purchase rights to future structured settlement payments in exchange for an immediate lump sum that generally is "significantly less than [the] face value" of the aggregate settlement proceeds (*see Cordero v Transamerica Annuity Serv. Corp.*, 34 F4th 994, 996 [11th Cir 2022]). The factoring industry has been criticized for preying on structured settlement tort victims, encouraging them to enter into transactions that are not financially sound (*see* Assembly Mem. in Support, 2002 McKinney's Session Laws of NY at 2035, 2036 [discussing factoring companies' use of "aggressive advertising, plus the allure of quick and easy cash, to induce settlement recipients to cash out future payments, often at substantial discounts, depriving victims and their families of the long-term financial security their structured settlements were designed to provide"]; *see also* Laura J. Koenig, *Note, Lies, Damned Lies, and Statistics? Structured Settlements, Factoring, and the Federal Government,* 82 Ind LJ 809, 813 [2007]).

Beginning in 2012, when Cordero was 22 years old and living in Florida, he engaged in six transfers in less than two years resulting in the assignment to various factoring companies of all his periodic payment rights. Those future structured settlement payments, spread over a period of more than twenty years, had an aggregate value of $959,834.42. In return, Cordero received $268,130.

To accomplish each transfer, a court hearing was required pursuant to Florida's Structured Settlement Protection Act (SSPA). SSPAs have been enacted in 49 states, including Florida and New York, to address concerns about factoring companies'

potentially exploitative practices. As stated in Florida's SSPA in effect at the time of the transfers, the law aims to "protect recipients of structured settlements who are involved in the process of transferring structured settlement payment rights" (Fla. Stat. § 626.99296 [1]). It provides that any such transfer must be "authorized in advance in a final order by a court of competent jurisdiction" (*id.* [3] [a]). Furthermore, factoring companies must provide notice of the proposed transfer "to all interested parties," including issuers and obligors, notifying those parties that they "may support, oppose or otherwise respond to the [factoring company's] application, in person or by counsel, by submitting written comments to the court or by participating in the hearing" (*id.* [4] [a] [4]). The court must hold a hearing on the application and "[t]he payee shall appear in person at the hearing unless the court determines that good cause exists to excuse the payee from appearing" (*id.* [4] [a] [5] [c]).

"If a proposed transfer would contravene the terms of the structured settlement, upon the filing of a written objection by any interested party and after considering the objection and any response to it, the court may grant, deny, or impose conditions upon the proposed transfer which the court deems just and proper given the facts and circumstances and in accordance with established principles of law" (*id.* [3] [b]). Before approving a transfer under the SSPA, a Florida court must find that (1) the transfer does not "contravene . . . applicable law"; (2) the "payee has established that the transfer is in [their] best

interest"; and (3) "the net amount payable to the payee is fair, just and reasonable under the circumstances" (*id.* [3] [a] [1], [3], [6]).[3]

A Florida state court approved each transfer agreement after an SSPA hearing. Cordero did not attend the hearings, nor did counsel appear on his behalf. Transamerica Life did not participate, but it received a $750 administrative fee from the factoring companies for each transfer. The factoring companies were the only parties represented at the hearings.

Cordero commenced this breach of contract action against defendants in federal court in Florida, contending that he could not read or understand the transfer documents and that defendants had an obligation to enforce the anti-assignment clauses in the Settlement Agreement and Qualified Assignment on his behalf. Defendants moved to dismiss the suit, asserting that Cordero failed to allege a breach of contract because the anti-assignment clauses were meant for their benefit, not his, and they had no obligation to enforce them. The United States District Court for the Southern District of Florida dismissed the suit, holding that Cordero's "claims fail because [d]efendants had no affirmative obligation to prevent [him] from assigning his annuity benefits" (*Cordero v Transamerica Annuity Serv. Corp.*, 1:18-CV-21665, 2021 WL 1198705, at *3 [SD Fla Mar. 29, 2021]). It determined that the Settlement Agreement's anti-assignment clause "exists

---

[3] A provision was added to the Internal Revenue Code in 2002 as "an additional compliance mechanism for using the SSPAs because it imposes a 40 percent federal excise tax if a transfer of structured settlement payment rights does not receive the required court approval" (Hindert, et al., § 16.05 [1]; *see* Internal Revenue Code [26 USC] § 5891).

for [d]efendants' benefit and may be exercised at their discretion" and that Cordero's "assertion[s] that [d]efendants should have prevented the state court-approved transfers are nothing more than attempts to 'imply obligations inconsistent with other terms of the contractual relationship . . . ' " (*id.*). Cordero appealed.

The Eleventh Circuit deferred decision of the appeal and certified a question to us (34 F4th at 1002). Cordero, that court noted, alleged that defendants "breached the anti-assignment language in the Settlement Agreement and the Qualified Assignment when [they] allowed Cordero to assign his payment rights to the factoring companies" in breach of the implied covenant of good faith under New York law (*id.* at 999). In considering that issue, the Court was uncertain whether our holding in *511 Owner's Corp v Jennifer Realty* supported finding a breach of the implied covenant in this case (*id.* at 1001; *see Jennifer Realty*, 98 NY2d 144, 153 [2002] [holding that the plaintiffs sufficiently alleged that a sponsor hired to convert an apartment building into a cooperative breached the implied covenant of good faith and fair dealing by engaging in tactics that frustrated the purpose of the conversion, which "drastically undermined the contract" such that "its fundamental objective . . . had been subverted"]). The Eleventh Circuit sought clarification by certifying the following question:

> "Does a plaintiff sufficiently allege a breach of the implied covenant of good faith and fair dealing under New York law if he pleads that the defendant drastically undermined a fundamental objective of the parties' contract, even when the underlying duty at issue was not explicitly referred to in the writing?" (*id.* at 1002.)

The Eleventh Circuit specified that in drafting the question, it did "not intend" to limit this Court's "discretion in choosing how to frame or to answer these issues in the light of the facts of this case" (*id.*). We accept the invitation to reformulate the question so that we may provide the Eleventh Circuit with a meaningful answer that may help in determining the outcome of this particular case (*see* NY Const, art VI, § 3 [b], cl 9; 22 NYCRR 500.27; *Yesil v Reno*, 92 NY2d 455, 457 [1992]; *see also* Judith S. Kaye & Kenneth I. Weissman, Interactive Judicial Federalism: Certified Questions in New York, 69 Fordham L Rev 373, 392 [2000]).

Accordingly, we reformulate the certified question as follows:

> Does a plaintiff sufficiently allege a breach of the covenant of good faith and fair dealing under New York law by pleading that (1) an issuer or obligor failed to object to plaintiff's sale of periodic payments in an SSPA proceeding, where the underlying agreements contain anti-assignment provisions, and (2) the sale approved by the SSPA court was not in plaintiff's best interest?

We answer that question in the negative.

The dissent criticizes our reformulation and would, instead, reformulate the question to ask whether New York's implied covenant requires defendants to "disclose plaintiff's diminished mental capacity in a statutorily mandated state SSPA judicial proceeding . . . " (dissenting op at 24). Defendants' failure to disclose is not a claim at issue in this case,[4]

---

[4] According to the Eleventh Circuit, Cordero alleges that his agreements with the factoring companies "failed to disclose his limited mental capacity" (34 F4th at 996). However, there is no allegation that Cordero was harmed by defendants' failure to disclose that information. Rather, the Eleventh Circuit states that, "[b]y suing [defendants], Cordero seeks to hold [them] accountable for *consenting* to his assignments" (*id*. [emphasis added]).

however, and our precedent requires that "[w]e rely solely on the facts presented by the

certified question," including "[t]he claims in the facts presented to us" (*Engel v CBS, Inc.*,

93 NY2d 195, 206-207 [1999]).   To do otherwise would violate our constitutional

obligation to answer only certified "questions . . . which may be determinative of the cause

then pending in the certifying court" (NY Con, article VI, section 3 [b], clause 9; *see* 22

NYCRR 500.27).  As stated by the Eleventh Circuit, "This case presents a novel issue of

New York law because Cordero seeks to hold Transamerica liable for consenting to his

assignments of his structured settlement payments" (34 F4th at 1002).   The dissent's

---

Instead of focusing on that claim, the dissent points to the complaint's assertion "that '[d]efendants failed to disclose to the state court that [Cordero's] purported rationales for the immediate needs for cash contained in the stipulations were fict[it]ious duplicitous and misleading' " (dissenting op at 23).  Apart from that assertion being different from a duty to disclose Cordero's mental impairment, as promoted by the dissent, it does not encompass the act that the complaint claims caused injury to Cordero, which is that, "[i]n refusing to enforce the anti-assignment provision on six different occasions over a two-year period, [d]efendants breached their contractual duties to [Cordero]" and, "[a]s a direct and proximate result of that breach, [Cordero] has suffered long-lasting damages."  This is also how the Eleventh Circuit construes Cordero's claim—i.e., as being about a duty to enforce the anti-assignment provision and not simply a duty to disclose information about Cordero.  Furthermore, we disagree with the dissent that a duty to disclose information about Cordero is coextensive with a duty to enforce the anti-assignment provisions (*see id*. at 3 n 1).  A duty to enforce an anti-assignment provision would require more than merely disclosing information about Cordero's condition that defendants "knew or should have known" (*id*. [internal quotation marks omitted]).  Despite the dissent's argument to the contrary (*see id*.), the leeway that the Eleventh Circuit provided us in answering its question does not permit us to construe Cordero's breach of contract claim differently than that court presented it to us.  As this Court has previously admonished, we must be "mindful [that] . . . this Court's role, in constitutionally participating with the Federal court in its exclusive jurisdictional application and adjudication of substantive principles of New York State law[,] is formally and appropriately limited" (*Rooney v Tyson*, 91 NY2d 685, 693 [1998], citing NY Const, art VI, § 3 [b] [9]; 22 NYCRR 500.27).

proposed question would not yield an answer that is determinative of that claim, however, and it would lead to our providing an improper advisory opinion on a controversy that is not before us (*see Self-Insurer's Assn. v State Indus. Commn.*, 224 NY 13, 16 [1918] [Cardozo, J.]). In contrast, our reformulated question and answer—with which the dissent agrees (dissenting op at 2-3)—allows the Eleventh Circuit to determine the issue before it: whether, under New York law, defendants "had a duty to 'enforce' the anti-assignment language" pursuant to the implied covenant of good faith and fair dealing (34 F4th at 999).

## II.

In New York, "all contracts imply a covenant of good faith and fair dealing in the course of performance" (*Jennifer Realty*, 98 NY2d at 153). This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (*Dalton v Educational Testing Serv.*, 87 NY2d 384, 389 [1995] [internal quotation marks omitted]). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion" (*id.*). This Court has consistently observed that the covenant requires the parties to perform under the contract "in a reasonable way" (*New York Cent. Ironworks Co. v United States Radiator Co.,* 174 NY 331, 335 [1903]). In discerning what is "reasonable," the Court looks to what the parties would have expected under the contract: the Court will infer that contracts "include any promises which a reasonable person in the position of the promisee would be justified in understanding were included" at the time the contract was made (*Rowe v Great Atl. & Pac. Tea Co.,* 46 NY2d 62, 69 [1978] [internal quotation marks omitted], quoting 5

Williston, Contracts [rev ed, 1937], § 1293, p 3682; *see Wilson v Mechanical Orguinette Co.*, 170 NY 542, 550-551 [1902]).  "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship" (*Murphy v Am. Home Products Corp.*, 58 NY2d 293, 304 [1983]).

The burden of proving an implied promise falls on the plaintiff:  "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists" (*Rowe*, 46 NY2d at 69).  "Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole" (*id.*).  Additionally, for a plaintiff to plead a valid cause of action for breach of the covenant of good faith, a plaintiff must allege facts sufficient to demonstrate that the plaintiff "reasonably understood" the contract or contractual provision at issue to state a duty to take or refrain from taking a particular action (*Jennifer Realty*, 98 NY2d at 154).

In *Jennifer Realty*, plaintiffs, shareholders in a cooperative corporation, asserted a breach of contract claim based on the duty of good faith and alleged that the cooperative's sponsor breached its duty to dispose of shares within a reasonable time by retaining a majority of shares in the building and allowing the offering plan to lapse, and rejecting purchase offers for unsold units (*id.* at 150-151).  We held that, "particularly in light of the sponsor's duty imposed by the Attorney General not to abandon the offering plan after filing an effectiveness amendment," plaintiffs' contract cause of action withstood the

sponsor's CPLR 3211 motion to dismiss (*id.* at 153). That case does not, however, stand for a general proposition that a plaintiff can invoke the implied covenant by simply alleging that a defendant's conduct "drastically undermined a fundamental objective of the parties' contract" (34 F4th 994, 1001 [11th Cir 2022]). Rather, the implied duty must arise from the contract and the promisee's reasonable expectations (*Jennifer Realty*, 98 NY2d at 153).

Here, Cordero claims that the anti-assignment provisions provide that reasonable expectation because they can be read to require issuers and obligors to protect plaintiffs from their own actions by objecting to their attempts to make further assignments. This theory is, of course, dependent on the view that the anti-assignment provisions in structured settlement and qualified assignment agreements are, at least in part, for a plaintiff's benefit. Even assuming that is true, however, a reasonable person in the position of such a plaintiff would not be justified in believing, at the time the agreements were made, that the anti-assignment provisions required the issuer and obligor to object to any attempt the plaintiff made to execute prohibited assignments as part of an SSPA proceeding in which the court is charged with determining whether the transfer is "in the best interest of the payee" (Fla. Stat. § 626.99296; *see also* General Obligations Law § 5-1707 [b]).

To hold otherwise would create an implied fiduciary duty—on the part of issuers or obligors—to protect a plaintiff from the consequences of their own breach. Structured settlement agreements, however, do not contemplate a fiduciary relationship. Implying a fiduciary duty into a standard structured settlement agreement would be contrary to this Court's hesitation to "transport" contracting parties "to the higher realm of [a fiduciary] relationship and fashion the stricter duty for them" when they have not "create[d] their own

relationship of higher trust" in the contract's express terms (*Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 162 [1993]).  Instead, under the SSPA, the court, not the issuer or obligor, is tasked with being the gatekeeper who determines whether a plaintiff's assignment of periodic payments under a structured settlement agreement is in their best interests.

Accordingly, the certified question, as reformulated, should be answered in the negative.

RIVERA, J. (dissenting):

"There is no level of exposure to lead that is known to be without harmful effects" (World Health Organization, Lead Poisoning, https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health [last updated Aug. 31, 2022]).

"The neurological and behavioural effects of lead are believed to be irreversible" (*id.*).

The Eleventh Circuit has asked us to clarify the scope of New York's implied covenant of good faith and fair dealing as applied to a tort victim's structured settlement and annuity agreements. Plaintiff Lujerio Cordero's federal complaint alleges that he suffers from mental impairment caused by childhood lead poisoning and that defendants, Transamerica Annuity Service Corporation and Transamerica Life Insurance Company, and their predecessor, issued and funded the settlement proceeds to which he is entitled through periodic annuity payments. Shortly after the annuity payments commenced, predatory companies took advantage of his cognitive limitations to persuade him to sell them the payments in exchange for a pittance. Plaintiff further alleges that despite the anti-assignment clauses in the structured settlement documents, defendants failed to make any effort to further the interests protected by these clauses and thus undermined the purpose of the settlement.

In reformulating the question before this Court, the majority recenters the analysis purely on the question of whether the plaintiff has a duty to object during an SSPA proceeding. That reformulation loses the forest for the trees. Instead, I read the Eleventh Circuit to require a response as to the scope of the implied covenant of good faith and fair dealing given the facts as alleged by the plaintiff. I agree with the majority that the implied covenant does not require defendants to object to the settlement transfers in a statutorily mandated Florida state judicial proceeding to approve those transfers. However, this case must be decided on the principle that the implied covenant between plaintiff and Transamerica represents an implied promise that defendants will not undermine the

purpose of the agreements' anti-assignment clauses: to provide plaintiff with the requisite financial resources to secure an independent and stable life. In the case of plaintiff, who alleges that he is unable to appreciate the consequences of the transfers due to the harm caused by environmental lead toxin exposure, the covenant encompasses a duty to disclose his mental impairment to the state court.[1]

Plaintiff's action does not arise in a vacuum. In light of the extensive scientific evidence documenting the devastating effects of lead poisoning on human cognitive function, local, state, and federal authorities have promulgated strict regulations to protect

---

[1] The majority contends that my reformulation of the certified question would not be determinative of the cause pending before the Eleventh Circuit (*see* majority op at 9-11). However, the majority construes the "cause" too narrowly (NY Const, art VI, § 3 [b]). The ultimate question pending before the Eleventh Circuit is whether the District Court erred in granting defendants' motion to dismiss plaintiff's breach of contract claim for failure to state a cause of action under Federal Rule of Civil Procedure 12 (b) (6). The answer to my proposed reformulation seeks to define the scope of the contractual duty owed by defendants to plaintiff under the facts alleged in the complaint. Surely, then, the answer to my proposed reformulation may be determinative of the ultimate question. Moreover, in asserting that I have impermissibly strayed from the Eleventh Circuit's presentation of the legal and factual issues, the majority ignores that the Eleventh Circuit "d[id] not intend to restrict the issues considered by [this Court] or to limit [this Court's] discretion in choosing how to frame or answer the[] issues in the light of the facts of this case," and "ask[ed] broadly for [our] help in getting the state law right" (*Cordero v Transamerica Annuity Service Corporation*, 34 F4th 994, 1002 [11th Cir 2022] [internal quotation marks omitted]). The majority correctly notes that the Eleventh Circuit focused on whether defendants "had a duty to 'enforce' the anti-assignment language" in the settlement agreement (*id.* at 999; *see* majority op. at 11), but fails to appreciate that, as plaintiff has argued before this Court, defendants could discharge that enforcement duty by disclosing relevant information about plaintiff's impairment to the SSPA court. As plaintiff points out, defendants have previously disclosed information to Florida courts in SSPA proceedings. And to the extent the majority implies otherwise, the complaint asserts that defendants "knew or should have known" that plaintiff lacked the capacity to transfer his structured settlement rights.

citizens from residential lead exposure. And where those regulations fail, New York law provides robust private tort remedies for impacted citizens, and both Congress and the New York State Legislature have enacted structured settlement regimes to protect tort victims from the rapid dissipation of their settlements. I dissent today to affirm that New York law governing the implied covenant of good faith and fair dealing to a tort victim's breach of contract action must be read with consideration of the unique historical and legal context in which the parties entered their agreements.

## I.

### *Lead Poisoning*

The toxicity of lead "has been recognized since at least the second century BCE, when the Greek physician Discorides observed that 'lead makes the mind give way'" (Philip J. Landrigan, *Lead and the heart: an ancient metal's contribution to modern disease*, The Lancet Public Health, March 12, 2018, available at https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(18)30043-4/ [last accessed March 21, 2023]; *see* Karla A. Francken, Comment, *Lead-Based Paint Poisoning Liability: Wisconsin Realtors, Residential Property Sellers, and Landlords Beware*, 77 Marq L Rev 550, 550 [1994]). By the early 1920s, physicians were aware that childhood lead poisoning caused by lead-based paint was a widespread problem. Some countries enacted measures to ban or restrict the use of lead paint on interior surfaces at that time (*see* Richard Rabin, *Warnings Unheeded: A History of Child Lead Poisoning*, 79 Am J Pub

Health 1668, 1669 [1989]). The City of New York banned the use of lead-based paint on interior building surfaces in 1960 (*see Juarez v Wavecrest Mgt. Team*, 88 NY2d 628, 641 [1996]). In 1970, the State of New York enacted legislation to prevent and control lead poisoning based on findings that "lead poisoning in children ha[d] become a major public health concern" (L 1970, ch 338, § 1, at 1715). Soon after, Congress enacted legislation prohibiting the use of lead-based paint in residential structures built by or with the assistance of the federal government (*see* Pub L 91-695, 84 US Stat 2079 [91st Cong, Jan. 13, 1971]; 42 USC § 4831).

Beginning in the 1970s, research demonstrated that lead caused "irreversible, asymptomatic effects far below levels previously considered safe" (Marie Lynn Miranda et al., *The Relationship between Early Childhood Blood Lead Levels and Performance on End-of-Grade Tests*, Environmental Health Perspectives, Vol 115, No. 8, at 1242 [Aug 2007]). In 1991, the U.S. Centers for Disease Control (CDC) issued a Strategic Plan for the Elimination of Childhood Lead Poisoning that declared this toxin-induced malady "the most common and societally devastating environmental disease of young children" (Centers for Disease Control, U.S. Department of Health and Human Servs., Strategic Plan for the Elimination of Childhood Lead Poisoning at xi [1991]; *see also Juarez*, 88 NY2d at 641 ["(c)hildhood lead-paint poisoning may be the most significant environmental disease in New York City"]). In the strategic plan, the CDC explained that lead was "particularly harmful to the developing brain," and sounded the alarm that even relatively low blood lead levels were found to be associated with "decreased intelligence," "slower neurobehavioral development," and "behavioral disturbances" (Strategic Plan for the

Elimination of Childhood Lead Poisoning at 5). The CDC referenced a 1990 study which showed that, "for children exposed to moderate lead levels during preschool years, the odds of dropping out of high school were seven times higher and the odds of a significant reading disability were six times higher than for children exposed to lower lead levels" (*id.* at 6). Such evidence demonstrated "[t]he apparent persistence or irreversibility of many of lead's neurobehavioral effects" (*id.*). The CDC further noted that "millions of children" had dangerously high blood lead levels, but that abatement of lead paint had, up to that point, been "neither widespread nor effective" (*id.* at ii). Indeed, in the early 1990s, lead paint still covered the walls of two thirds of New York City dwellings despite the implementation of federal and local legislation prohibiting the use of lead paint (*see Juarez*, 88 NY2d at 641, citing 1993 Final Report of Mayor's Advisory Comm to Prevent Childhood Lead-Paint Poisoning, at 1). In Westchester County, where plaintiff lived for a period of time, "many children are potentially at risk for lead related, lifelong learning disabilities, behavioral problems and other serious health issues" due to the fact that 85% of homes were constructed prior to the enactment of the 1978 federal lead paint legislation (Westchester County, Lead Paint, https://homes.westchestergov.com/lead-paint).

The devastating effects of lead poisoning are also lifelong. Exposure to low levels of lead commonly "increases the need for enrollment in special education services, reduces the likelihood of high school and college graduation, [and] lowers lifetime earnings" (*see* Karen Syma Czapanskiy, *Structured Settlement Sales and Lead-Poisoned Sellers: Just Say No*, 36 Va Envtl LJ 1, 5 [2018] [internal quotation marks omitted]). Thus, children affected by lead exposure may have difficulty learning to read (*see id.* at 6). They also commonly

encounter behavioral issues, such as "impulsivity, aggression, and short attention span" (*id.* [internal quotation marks omitted]). These impacts are long-lasting and result in lower cognitive functioning and socioeconomic status into adulthood (*see* Aaron Reuben et al., *Association of Childhood Blood Lead Levels with Cognitive Function and Socioeconomic Status at Age 38 Years and With IQ Change and Socioeconomic Mobility Between Childhood and Adulthood*, JAMA, March 28, 2017, available at https://jamanetwork.com/journals/jama/fullarticle/2613157 [last accessed March 23, 2023]). Notably, lead poisoning impairs a person's executive functioning, which leaves that person particularly ill-equipped to understand the ramifications of selling their structured settlement rights to a factoring company (*see* Czapanskiy, *supra* at 6-7).

At the time of the CDC's 1991 plan, researchers understood that childhood blood lead levels of 10 micrograms per deciliter (ug/dL) adversely affected neurobehavioral development. However, they did not fully understand the impact of lower blood lead levels (*see* Strategic Plan for the Elimination of Childhood Lead Poisoning at 6). Later research showed that blood lead levels as low as 5 ug/dL were associated with "severe declines" in intelligence (Marie Lynn Miranda et al., *supra* at 1242). In 2012, the CDC changed its threshold "level of concern" of 10 ug/dL to a "reference value" of 5 ug/dL (*see* Centers for Disease Control and Prevention, Blood Lead Reference Value, https://www.cdc.gov/nceh/lead/data/blood-lead-reference-value.htm [last accessed March 22, 2023]). In 2021, the CDC lowered the reference value from 5 ug/dL to 3.5 ug/dL (*see id.*), for "even blood lead concentrations as low as 3.5 ug/dL may be associated with decreased intelligence in children, behavioural difficulties and learning problems" (World

Health Organization, Lead Poisoning, https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health). One study from 2009 concluded that reducing blood lead levels to less than 1 ug/dL among all U.S. children would significantly increase rates of high school graduation and decrease crime, producing an overall societal savings of $1.2 trillion annually (*see* Peter Muennig, *The Social Costs of Childhood Lead Exposure in the Post-Lead Regulation Era*, Arch Pediatr Adolesc Med, Sept. 7, 2009, available at https://jamanetwork.com/journals/jamapediatrics/fullarticle/382153).

More recent research has revealed the lasting health impacts of lead in the environment. A 2021 study concluded that more than half of U.S. adults had elevated blood lead levels in early childhood (*see* Michael J. McFarland et al., *Half of US population exposed to adverse lead levels in early childhood*, PNAS, March 7, 2022, available at https://www.pnas.org/doi/10.1073/pnas.2118631119 [last accessed March 21, 2023]). According to the World Health Organization, young children "absorb 4-5 times as much ingested lead as adults," and as such are particularly vulnerable to lead's long term effects (World Health Organization, Lead Poisoning, https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health [last updated Aug. 31, 2022]). Once lead is absorbed, "it is distributed to organs such as the brain, kidneys, liver and bones," and accumulates in the teeth and bones (*id.*). "Undernourished children" are at even greater risk, because their bodies absorb more lead when other nutrients are absent (*id.*).

When lead exposure reaches the highest levels, "lead attacks the brain and central nervous system, causing coma, convulsions and even death" (*id.*). Even if a child survives severe lead poisoning, they may be affected by "intellectual disability and behavioural

disorders" (*id.*). Indeed, "[t]he neurological and behavioural effects of lead are believed to be irreversible" (*id.*).

Because lead is present in older buildings, including historic buildings, children across a wide economic spectrum are at risk of exposure (*see* Yale Medicine, Lead Poisoning [in Children], https://www.yalemedicine.org/conditions/lead-poisoning-in-children [last accessed March 30, 2023]). However, childhood lead poisoning is most prevalent in communities with high rates of poverty—neighborhoods where Black and Latino children are more likely to live than White children (*see* Emily A. Benfer, *Contaminated Childhood: How the United States Failed to Prevent the Chronic Lead Poisoning of Low-Income Children and Communities of Color*, 41 Harv Envtl L Rev 493, 504 [2017]; World Health Organization, Lead Poisoning, https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health ["the very young (including the developing fetus) and the economically disadvantaged" are at greatest risk of lead poisoning]). As an unsurprising consequence, poisoning from lead-based paint—like other environmental toxic conditions—disproportionately impacts communities of color at strikingly high rates (United States Environmental Protection Agency, Environmental Risk and Impact in Communities of Color and Economically Disadvantaged Communities, https://cfpub.epa.gov/si/si_public_record_report.cfm [last accessed March 30, 2023]). Black children are almost three times more likely to have elevated blood lead levels than White children, and "[i]n one study, toxicity prevalence rates in Black and [Latino] neighborhoods topped 90% of the child population" (Benfer, 41 Harv Envtl L Rev at 505).

II.

*Lead Paint Regulations and Litigation*

As explained above, in 1960, New York City enacted local legislation prohibiting the use of lead-based paint on interior surfaces (*see Juarez*, 88 NY2d at 641).  In 1982, the City Council passed legislation placing upon landlords a duty to "remove or cover" paint with a hazardous level of lead in any leased premises where a child under seven years of age resides (*see id.* at 641-642, quoting former Administrative Code § 27-2013 [h] [1]). The 1982 provision created "a presumption of notice and imposed a specific duty on landlords to maintain their leased premises in reasonably safe condition with respect to lead paint hazards" and "to abate lead paint hazards," and instructed that breaching these duties exposed New York City landlords to tort liability (*Chapman v Silber*, 97 NY2d 9, 20 [2001], citing *Juarez*, 88 NY2d at 642). Moreover, in *Chapman*, the Court relied on common-law premises liability principles to conclude that, where there is no controlling local legislation, landlords throughout the State may be held liable for a child's lead paint exposure where "the landlord (1) retained a right of entry to the premises and assumed a duty to make repairs, (2) knew that the apartment was constructed at a time before lead-based interior paint was banned, (3) was aware that paint was peeling on the premises, (4) knew of the hazards of lead-based paint to young children[,] and (5) knew that a young child lived in the apartment" (*id.* at 15).

The current New York City lead paint regime, established by Local Law No. 1 of 2004 and since amended from time to time (*see* New York City Department of Housing

Preservation & Development, Lead-Based Paint, https://www.nyc.gov/site/hpd/services-and-information/lead-based-paint.page [last accessed March 30, 2023]), is set forth in Title 27 of the Administrative Code (*see* Administrative Code §§ 27-2056.1 *et seq.*). Landlords must provide tenants with an annual notice inquiring whether a child under six years of age resides in the leased premises (*see id.* § 27-2056.4 [d] [1]; [e], as amended by Local Law No. 40 of 2021).[2] If such a child resides there, the landlord is obligated to investigate the premises for lead paint hazards and remediate them (*see id.* § 27-2056.4 [a]). Dwellings constructed before 1960 are presumed to contain lead paint (*see id.* § 27-2056.5, as amended by Local Law No. 66 of 2019). Landlords must provide tenants with a pamphlet developed by the City Department of Health and Mental Hygiene which describes the hazards associated with lead-based paint and the landlord's responsibilities to remediate such hazards (*see id.* § 27-2056.4 [c]; *see also id.* § 17-179 [b], as amended by Local Law No. 40 of 2021).

Community organizations have long used litigation as a tool to protect children from lead poisoning. For example, in *Matter of Community Action Against Lead Poisoning v Lyons*, the petitioners brought a mandamus proceeding to compel Albany County officials to, among other things, "conduct and cause to be conducted a blood level screening program for all children under the age of six years in designated census tracts in the City of Albany," "compel landlords to delead dwellings found to contain a lead paint hazard,"

---

[2] The notice is made available online by the New York City Housing and Preservation Department (*see* https://www.nyc.gov/assets/hpd/downloads/pdfs/services/annual-notice-hpd.pdf [last accessed March 22, 2023]).

and implement "a lead poisoning control program" (43 AD2d 201, 203 [3d Dept 1974]). The Third Department dismissed the petition on the ground that mandamus did not lie, but purported to do so without "minimizing the tremendous problem of lead poisoning and its terrible threat to the well-being of young children" (*id.*). In a later case, a court concluded that New York City officials could be held liable for damages under a theory that their failure to enforce local and federal lead paint regulations "contribute[d] to the existence of lead poisoning in children" (*New York City Coalition to End Lead Poisoning v Koch*, 138 Misc 2d 188, 189 [Sup Ct, NY County 1987], *affd* 139 AD2d 404 [1st Dept 1988]).

Apart from these efforts to address the front-end problem of residential lead contamination and its effect on children, regulators and law enforcement agencies have also focused on protecting victim compensation from predatory actors, including factoring companies. A factoring company purchases a tort victim's structured settlement rights in exchange for a lump sum that is, as the majority notes, typically far less than the aggregate value of the settlement payments (*see* majority op at 5). When these companies emerged in the early 1990s, they launched aggressive advertising campaigns enticing tort victims to trade their structured settlements for cash (*see* Daniel W. Hindert & Craig H. Ulman, *Transfers of Structured Settlement Payment Rights: What Judges Should Know About Structured Settlement Protection Acts*, The Judges' Journal, Vol 44, No. 2, at 19 [Spring 2005]). This financial model may work well for a business that needs to build cash flow, but factoring companies have a history of predatory and coercive practices that result in tremendous financial loss for tort victims (*see id.* at 20; James Gordon, Note, *Enforcing*

*and Reforming Structured Settlement Protection Acts: How the Law Should Protect Tort Victims*, 120 Colum L Rev 1549, 1566 [2020]).

Factoring companies used dubious means to subvert the anti-assignment language that appears in most structured settlement contracts. Specifically, these companies have instructed tort victims to redirect payments to factoring company addresses without telling annuity issuers (*see* Hindert & Ulman, at 19-20). As early as 1995, factoring transactions that allegedly violated settlement agreements sparked litigation between factoring companies, annuity issuers, and structured settlement recipients (*see* Adam F. Scales, *Against Settlement Factoring? The Market in Tort Claims Has Arrived*, 2002 Wis L Rev 859, 901-902 [2002]; *see also Western United Life Assur. Co. v Hayden*, 64 F3d 833 [3d Cir 2005]). In 2016, the federal Consumer Financial Protection Bureau (CFPB) filed a complaint in federal district court against a factoring company "for an illegal scheme in which victims of lead-paint poisoning and others were deceived into signing away future settlement payments in exchange for a significantly lower lump-sum payout" (Consumer Financial Protection Bureau, *CFPB Sues Access Funding for Scamming Lead-Paint Poisoning Victims Out of Settlement Money*, Nov. 21, 2016, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-access-funding-scamming-lead-paint-poisoning-victims-out-settlement-money/ [last accessed March 23, 2023]).

As with the well-known effects of lead poisoning on children like plaintiff, when the parties entered the settlement and assignment agreements, governmental regulation and tort litigation were common responses to this public health crisis. Similarly, the predatory

conduct of factoring companies had been identified as a deceptive practice targeting tort victims.

## III.

### *Federal and State Laws*

The majority succinctly presents the relevant federal and state laws and I add the following for additional context.

Congress enacted the Periodic Payment Settlement Act (PPSA) in part to ensure that "tort victims, particularly minors, do not squander their settlement proceeds" (majority op at 2). The PPSA provides favorable tax treatment both to tort plaintiffs who agree to receive a structured settlement and to life insurance companies that accept a payment from a tort defendant to purchase an annuity to fund the structured settlement (*see* 26 USC § 130 [c]; Laura J. Koenig, *Lies, Damned Lies, and Statistics? Structured Settlements, Factoring, and the Federal Government*, 82 Ind L J 809, 811-812 [2007]). Minimizing dissipation of lump sum awards addressed the greater societal concern that the tort victim would eventually become a public charge, thus shifting the burden from the private tortfeasor—plaintiff's landlord—to the taxpayers.

Factoring company practices ultimately prompted State legislators to intervene, and in 1997, the first State Structured Settlement Protection Act passed in Illinois (*see* Hindert & Ulman, at 19). Judicial approval is the "cornerstone" of each state's Structured Settlement Protection Act (SSPA) (Structured Settlements and Periodic Payment Judgments § 16.04 [3] [b] [Oct. 2022]). Under the New York and Florida SSPAs, a court

cannot approve a transfer unless it is in the "best interest of the payee" (*see* General Obligations Law § 5-1706 [b]; Fla Stat § 626.99296 [3] [a] [3]; *see also* Structured Settlements and Periodic Payment Judgments § 16.04 [3] [b]). New York courts have observed that structured settlements are "designed to preserve the injured person's long-term financial security," and may conclude that a transfer is not in the payee's best interest if it will "jeopardiz[e] or irreparably impair[] the financial security afforded to the payee. . . by the periodic payments" (*J.G. Wentworth Originations, LLC v Genworth Life Ins. Co. of N.Y.*, 68 Misc 3d 1206[A], *2 [Sup Ct, Kings County 2020]; *see In re Settlement Capital Corp.*, 1 Misc 3d 446, 455 [Sup Ct, Queens County 2003]). Indeed, the Legislature did not intend the courts of this State "to be mere rubber stamps" on these transactions (*In re Settlement Capital Corp.*, 1 Misc 3d at 461; *see Matter of RSL Funding, LLC*, 71 Misc 3d 1205[A], *5 [Sup Ct, Rensselaer County 2021]).

A transfer may not be in the payee's best interest where they would receive a sum substantially less than "the price that a reasonably prudent purchaser would pay for such annuity on the open market" (*Settlement Funding of N.Y., LLC v Solivan*, 8 Misc 3d 1006[A], 2005 NY Slip Op 50946[U], *2 [Sup Ct, Kings County 2005]; *see also J.G. Wentworth Originations, LLC*, 68 Misc 3d 1206[A], *2), or where the payee intends to use the funds "to ease relatively minor financial burdens" such as paying off credit card debt or other loans (*Matter of RSL Funding, LLC*, 71 Misc 3d 1205[A], *6; *see Matter of Barr v Hartford Life Ins. Co.*, 4 Misc 3d 1021[A], 2004 NY Slip Op 50980[U], *4 [Sup Ct, Nassau County 2004]). On the other hand, an unfavorable transfer may be in the payee's best interests where the funds are necessary to avoid foreclosure on the payee's home or to

receive life-saving medical treatment (*see Matter of RSL Funding, LLC*, 71 Misc 3d 1205[A], \*6), although the court is not required to find that the payee is "suffering from a hardship" (General Obligations Law § 5-1706 [b]).

Courts have also considered "the demonstrated ability of the payee to appreciate the financial terms and consequences of the proposed transfer" (*Matter of Settlement Capital Corp v Yates*, 12 Misc 3d 1198[A], 2006 NY Slip Op 51616[U], \*5 [Sup Ct, Kings County 2006]), as well as the payee's "age, mental capacity, physical capacity, maturity level, independent income, and ability to support dependents" (*Matter of Settlement Funding of New York, LLC*, 2 Misc 3d 872, 876 [Sup Ct, Lewis County 2003]; *see Settlement Capital Corp. v State Farm Mut. Auto. Ins. Co.*, 646 NW2d 550, 556 [Minn Ct App 2002]). In one case, a court initially declined to move forward with a hearing on a transfer petition where the payee appeared "disoriented" and was unable "to explain the most basic terms" of the transfer (*Matter of RSL Funding, LLC*, 71 Misc 3d 1205[A], \*3). Courts of other jurisdictions similarly consider the payee's mental capacity and level of education before approving a transfer of structured settlement rights, as the consideration of such diminished capacity allows the trial court to "arriv[e] at an informed decision" on the best interests of the payee (*Matter of Rains*, 473 SW3d 461, 464 [Tex Ct App—Amarillo 2015]; *see Settlement Capital Corp. v State Farm Mut. Auto Ins. Co.*, 646 NW2d 550, 556 [Minn Ct App 2002]; *Matter of Keena*, 442 NJ Super 393, 401, 123 A3d 1052, 1057-1058 [2015]).

Case law interpreting the Florida SSPA is sparse, but the statute clearly announces that its purpose is "to protect recipients of structured settlements who are involved in the process of transferring structured settlement payment rights" (Fla Stat § 626.99296 [1]).

Further, the Florida legislature recognized that "the long-term financial security of the injured claimant" would be "at risk" where "the claimant does not understand the terms or consequences" of a transfer agreement with a factoring company (2001 Florida Senate Bill 108, Senate Staff Analysis and Economic Impact Statement, at 3). Thus, before a Florida court may approve a transfer of structured settlement rights, the court must make "written express findings" that the factoring company provided the payee with "a disclosure statement in bold type, no smaller than 14 points in size," which includes information such as the "aggregate amount" of the periodic payments, the "gross amount payable to the payee in exchange for the payments," an itemized list of fees and costs deductible from the gross amount, and "[t]he effective annual interest rate" paid to the factoring company (Fla Stat § 626.99296 [3] [a] [2] [b], [d], [e], [g]). The court must further find that "the net amount payable to the payee is fair, just, and reasonable under the circumstances then existing" (*id.* [3] [a] [6]), the payee received or waived the right to receive "independent professional advice" regarding the implications of the transfer (*id.* [3] [a] [4]), and the transfer does not "contravene other applicable law" (*id.* [3] [a] [1]). In addition, the factoring company must notify the annuity issuer of the transfer and include copies of the transfer agreement and the disclosure statement (*see id.* [4] [a]). The annuity issuer is invited to file "a written objection" with the court where a proposed transfer "contravene[s] the terms of the structured settlement" (*id.* [3] [b]). The court "may grant, deny, or impose conditions upon the proposed transfer which the court deems just and proper given the facts and circumstances" (*id.*).

In addition, in cases where a "minor or incompetent person" brings a civil action and is not otherwise represented, "[t]he court shall appoint a guardian ad litem for [the] minor or incompetent person . . . or shall make such other order as it deems proper for the protection of the minor or incompetent person" (Florida Rules of Civil Procedure rule 1.210 [b]). Florida courts have held that "[t]he policy of the rule is that the court should [e]nsure that the interests of the incompetent party will be protected until someone is qualified to succeed to [their] interests" (*Paul v Gonzalez*, 960 So 2d 858, 862 [Fla Dist Ct App 2008]).

## IV.

### *Plaintiff's Federal Action*

With this backdrop I now turn to plaintiff's federal action.

When plaintiff was two years old, his mother sued their landlord on his behalf over lead poisoning caused by exposure to lead paint and chips in their New York City apartment. The parties settled and eventually agreed to payment through a 30-year annuity in $3,183.94 monthly installments commencing when plaintiff turned 18 years old, for an approximate total payment of $1.1 million. The obvious purpose of the agreements was to provide a regular payment stream so that plaintiff could live a financially stable and independent life. The structured settlement had the added tax benefits provided under federal law.

As is obvious from the discussion above (*see* Parts I & II, *supra*), by the time the parties executed the settlement agreement and qualified assignment in 1996, "[t]he serious health hazard posed to children by exposure to lead-based paint" had been "well established" (*Juarez v Wavecrest Mgt. Team*, 88 NY2d 628, 640 [1996]). The parties could not help but appreciate that plaintiff was one of the thousands of children of color who would suffer lifelong cognitive impairment from lead poisoning.

Despite the parties' agreement terms and governmental efforts to minimize imprudent or unwary dissipation of tort victims' settlement monies, plaintiff transferred his entire settlement to factoring companies less than four years into the annuity payments. In six transfers over the course of two years, he transferred the rights to the annuity payments in exchange for a mere fraction their value. As a result, he did not receive even half the amount to which he was entitled. For example, in one transfer, plaintiff received $15,000 in exchange for $90,000 worth of monthly payments. In another, he received only $22,000 for aggregate payments of $167,134.42. In total, plaintiff received $268,130 from the factoring companies for structured settlement payments worth an aggregate value of $959,834.42.

With his settlement funds depleted, plaintiff sued in Florida federal district court. He alleged that he was a victim of predatory factoring companies that took advantage of

the cognitive impairment which made him unable to appreciate the consequences of these transfers.[3]

The second amended complaint alleges that defendants breached the settlement and assignment agreements, in particular the anti-assignment clauses intended to ensure plaintiff enjoyed the benefits of the settlement, by failing to take any action to ensure the proper enforcement of these clauses.

---

[3] The status of the factoring companies that purchased plaintiff's annuity payments is unclear. According to the complaint and the materials in the record, plaintiff transferred his payments to three Florida entities: (1) Singer Asset Finance Company, LLC; (2) Alliance Asset Funding, LLC, which is alleged to be an affiliate of Singer; and (3) Liberty Settlement Solutions, LLC. Records from the Florida Department of State reveal that Singer and Alliance are inactive entities which have not filed an annual report since 2015 (*see* Florida Department of State, Division of Corporations, Sunbiz.org, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=ALLIANCEASSETFUNDING%20L050000508210&aggregateId=flal-l05000050821-60ad136e-7377-4818-815d-4ab81d35010e&searchTerm=Alliance%20Asset%20Funding&listNameOrder=ALLIANCEASSETFUNDING%20L050000508210 [Alliance]; https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=SINGERASSETFINANCE%20M950000002990&aggregateId=forl-m95000000299-3d490d88-e859-420c-8408-338a2b58f992&searchTerm=singer%20asset%20finance%20company&listNameOrder=SINGERASSETFINANCE%20M950000002990 [Singer]). Singer has a Linked-In profile, but the link to its website provided on the profile is no longer functional (*see* https://www.linkedin.com/company/singer-asset-finance-company-l-l-c-). Liberty Settlement Solutions, LLC is listed as "inactive pending reinstatement" and has not filed an annual report since 2017 (*see* Florida Department of State, Division of Corporations, Sunbiz.org, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=LIBERTYSETTLEMENTSOLUTIONS%20L110000938050&aggregateId=flal-l11000093805-30e5107a-9b26-43f3-8d62-7076db09199e&searchTerm=Liberty%20Settlement%20Solutions%2C%20LLC&listNameOrder=LIBERTYSETTLEMENTSOLUTIONS%20L110000938050). However, the business appears to be still operating under the name Liberty Settlement Funding (*see* https://www.libertysettlementfunding.com/about-us/).

In addition to describing generally the harm to cognitive function caused by lead exposure, the complaint alleges specifically that plaintiff "suffered lead poisoning . . . causing debilitating and permanent health handicaps, particularly as to his cognitive capacity" and that his "mental handicaps, as foreseen in the structured settlement agreement continued as an adult," he could not pass the GED examination, "and his long-term employment prospects for anything other than low-grade jobs vary between bleak and nonexistent."

The complaint discusses the federal PPSA and its intent to encourage structured settlements with tax benefits directed to incentivize participation by the insurance industry while increasing the value of the settlement for tort victims. According to the complaint, "[s]tructured settlements were both a means to provide injured persons with long-term financial security and protect the public from persons who might otherwise become public charges."

The complaint also alleges that the provision of the PPSA exempting periodic settlement payments from federal income tax liability generated a multi-billion dollar marketplace for structured settlement annuities. A structured settlement may have greater value than the aggregate value of the payments as a lump sum, as the income earned through a lump sum would be taxable whereas income earned through an annuity would not.

The complaint explains how factoring companies use coercive tactics to secure rights to tort victims' settlement funds and how plaintiff was targeted by these companies.

According to the complaint, even the insurance industry took note of these predatory practices and formed a trade association—the National Structured Settlements Trade Association (NSSTA). The NSSTA and a trade association of factoring companies agreed on a legislative proposal which resulted in a state Model Structured Settlement Protection Act. The complaint further states that other major life insurance companies, including Berkshire Hathaway, Metropolitan Life, and Independent Life, have established programs to protect structured settlement holders from predatory transfers initiated by factoring companies. It alleges that defendant Transamerica is not a member of NSSTA and "makes no effort to address factoring abuse."

The complaint then describes the settlement and annuity agreements, both of which contain anti-assignment clauses providing that plaintiff shall not have "the power to sell, mortgage, encumber or anticipate [the periodic payments], or any part thereof, by assignment or otherwise," and "[n]one of the Periodic Payments may be accelerated, deferred, increased or decreased and may not be anticipated, sold, assigned or encumbered." The complaint further alleges that plaintiff is the direct or third-party beneficiary because only he could be injured by a breach of the anti-assignment clauses.

The complaint explains that each of the six transfers that resulted in the complete sale of plaintiff's settlement to factoring companies were claimed to be for payment of outstanding debts, educational expenses related to obtaining a GED, and a new vehicle. The complaint alleges that, in fact, plaintiff's debts constituted a fraction of the payments he received through the transfers, and the cost of obtaining a GED was likewise minimal.

The complaint asserts that "[d]efendants failed to disclose to the state court that the Payee's purported rationales for the immediate needs for cash contained in the stipulations were fict[it]ious duplicitous and misleading." It further claims that: defendants "knew or recklessly disregarded facts showing or should have known before agreeing to these transfers"; "[t]he [t]ransfers were not in Lujerio's best interests, and the grounds supposedly justifying [his] use of the transferred funds were pre-packaged language certain to have been solely the consequence of instruction and drafting by the [t]ransferee's salesmen"; "Lujerio's 'waiver of independent professional advice' was secured on identical forms prepared by the factoring companies when he had no knowledge or awareness of what such a waiver even was, let alone its implications"; the Florida court orders declaring the transfers fair and reasonable were "an artificial determination made by overworked courts based on the absence at a hearing of Lujerio or anyone on his behalf"; plaintiff "had no power under the anti-assignment clause to authorize the sale or assignment of his structured settlement payments, and was known by [d]efendants to be either a direct or intended third party beneficiary of that clause"; and "[t]he sales could have been prevented by [defendants] simply objecting and invoking the anti-assignment clause, after a minimal investigation demonstrated [plaintiff's] lead-poisoned status."

The Eleventh Circuit certified the following question: "Does a plaintiff sufficiently allege a breach of the implied covenant of good faith and fair dealing under New York law if he pleads that the defendant drastically undermined a fundamental objective of the

parties' contract, even when the underlying duty at issue was not explicitly referred to in the writing?"

The majority reformulates this certified question to whether defendants have a duty to object. For the reasons explained above, I would reformulate the question as follows:

Does the implied covenant of good faith and fair dealing under New York law encompass a promise that defendant will not undermine the purpose of the parties' settlement and annuity agreements to secure a steady cash flow intended to provide a cognitively impaired plaintiff with a financially stable and independent life, thus requiring that defendants disclose plaintiff's diminished mental capacity in a statutorily mandated state SSPA judicial proceeding to approve transfers of the plaintiff's settlement funds?

As reformulated, the question should be answered in the affirmative.

V.

*Implied Covenant of Good Faith and Fair Dealing*

The covenant of good faith and fair dealing is implied in all contracts governed by New York law (*see 511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002] [hereinafter, *Jennifer Realty*]). It is well settled that the covenant includes "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," as well as "any promises which a reasonable person in the position of the promisee would be justified in understanding

were included" (*id.* [internal quotation marks omitted]; *see Dalton v Educational Testing Serv.*, 87 NY2d 384, 389 [1995]). In *Jennifer Realty*, our Court concluded that the plaintiffs sufficiently pleaded a breach of contract claim because the sponsor undertook a duty at a minimum "to timely sell so many shares in the building as necessary to create a fully viable cooperative" (98 NY2d at 152). The complaint alleged, among other things, that the sponsor defeated the purpose of the contract by keeping the majority of the shares in the building, interfering with the plaintiffs' ability to resell their shares, hampering the Co-op Board's refinancing of the mortgage, and causing an increase in the maintenance payments, thereby sufficiently alleging that the sponsor's retention of shares "so dramatically undermined the contract that its fundamental objective—the creation of a viable cooperative—ha[d] been subverted" (*id.* at 153). Thus, *Jennifer Realty* stands for the proposition that parties cannot undermine the purpose of their agreement, and that the purpose is gleaned from the agreement itself.

*Jennifer Realty* is instructive but does not account for cases where the plaintiff lacks capacity to appreciate whether their own actions might undermine the purpose of an agreement under which transfers are allowable only once a court approves them as in the payee's best interest. Here, plaintiff was a child when the settlement agreements were signed and his mother acted on his behalf. The toxic tort that he experienced during his childhood left him unable to, as an adult, understand the transfers, their impact on his future, and their potential to render him impoverished. But the whole point of the structured settlement and the anti-assignment clauses was to protect settlement funds from dissipation

resulting from plaintiff's diminished mental capacity. Unlike the tenants in *Jennifer Realty* who could understand the actions of the sponsor and act to protect themselves, plaintiff was unable to protect himself against the predatory actions of the factoring companies. Therefore, the covenant of fair dealing and good faith that New York law implies in the parties' agreements must account for the parties' appreciation of the plaintiff's special needs.

Like in *Jennifer Realty*, the implied covenant encompasses defendants' promise not to undermine the purpose of the agreements. The settlement and annuity agreements are intended to compensate plaintiff for toxic harm that caused his diminished mental capacity and lost future opportunities. That purpose is achieved by an annuity that provides a thirty-year cash stream that serves as the basis for his financial stability and independence in adulthood.

Moreover, the structured settlement was facilitated by federal tax reforms. That legislation and its anti-assignment requirement was animated by the concern that tort victims would lose the benefit of their settlements and become public charges. The anti-assignment clauses were designed to prevent the taxpayers from shouldering that cost, in part, by incentivizing structured settlement arrangements like the one entered into by the parties. This is especially true where the victim, like plaintiff, is mentally impaired and unable to fully appreciate the mechanics of the transfers and their consequences. This class of tort victim is uniquely vulnerable to dissipation of their settlement funds through predatory tactics. Additionally, plaintiff—like other structured settlement payees—cannot

unilaterally transfer his interest in the settlement funds but can only do so with court approval if it is in his best interest.

Given plaintiff's diminished mental capacity, that defendants voluntarily entered agreements with anti-assignment clauses to take advantage of the federal tax benefits, that the federal regime is intended to protect tort victims from injudicious dissipation of their settlement funds, and the known predatory practices of factoring companies, a "reasonable person" in plaintiff's mother's position "would be justified in understanding" (*id.* at 153) that the covenant of good faith and fair dealing includes the insurer and annuity company's dual promises.[4] The first promise is that they will not undermine or knowingly assist third-party interference with the purpose of the agreements to provide plaintiff with a steady cash stream during adulthood. The second one is that they will ensure that any transfer in contravention of the anti-assignment clauses will further that same purpose. Here, once defendants were on notice of the Florida court proceedings to determine whether to approve the transfers if in plaintiff's best interest, the implied covenant

---

[4] It is true, as the majority states, that under the SSPA the court, not defendants, must decide whether the assignment was in plaintiff's best interest (*see* majority op at 14). However, defendants' responsibilities under the agreements are not so easily disposed of. The relevant question is what if any promise can be implied from the structured settlement agreements as to defendants' responsibility when put upon notice of the transfers and the SSPA judicial proceeding. For the reasons I have discussed, the implied covenant of good faith and fair dealing, at a minimum, includes a promise not to undermine the intended purpose of the structured settlement or the payee's right to receive the benefit of the settlement. In the case of a mentally impaired payee, a structured settlement agreement encompasses a promise to disclose those cognitive limitations that may render the payee unable to fully appreciate the long-term ramifications of an assignment so that the court may properly assess whether the payee made knowing transfers of his annuity payments and whether they are in the payee's best interest.

encompassed a minimal duty that defendants disclose plaintiff's diminished mental capacity to knowingly agree to such transfers. This ensures that the Florida courts have the information they require to determine whether to approve the transfers. The covenant places no undue burden on defendants and is fully within what reasonable parties in defendants' position would understand is their minimal duty.[5] As plaintiff alleges, other insurance and annuity companies have done more to protect payees (*see e.g. Rapid Settlements, Ltd. v Dickerson*, 941 So 2d 1275 [Fla Dist Ct App 2006] [structured settlement obligor and annuity issuer, invoking contractual anti-assignment language, successfully objected to transfer in Florida SSPA proceeding]; *Matter of Foreman*, 365 Ill App 3d 608, 850 NE2d 387 [Ill App Ct 2006] [same, but in an Illinois SSPA proceeding]; *J.G. Wentworth S.S.C. Ltd. Partnership v Callahan*, 256 Wis 2d 807, 649 NW2d 694 [Wis Ct App 2002] [structured settlement obligor and annuity issuer opposed factoring company's request for a declaration that the anti-assignment clause in the annuity contract was unenforceable]).

Having answered a reformulated version of the Eleventh Circuit's question, it is now for that Court to determine, under federal pleading standards, whether plaintiff's

---

[5] Under the Florida SSPA, defendants could have chosen to oppose any or all of the transfers. I agree with the majority the implied covenant does not impose a mandatory duty to oppose a transfer in all cases where a payee seeks early access to their settlement funds at a reduced rate. The purpose of the settlement is a secure financial stream to ensure financial stability and an early payment may best achieve that end. It would be a different case, for example, if plaintiff needed the funds for life saving medical assistance, or if he needed funds to improve his financial security, or if he had only two years left on the annuity and an immediate lump sum payment would not place him at risk of impoverishment.

federal complaint alleges a violation of our State's implied covenant of good faith and fair dealing.

## VI.

### *Conclusion*

Lead poisoning is irreversible and results in permanent and severe impairment. Its victims suffer diminished mental ability and neurobehavioral development. They have limited executive function, which adversely affects their ability to manage daily tasks, focus and achieve goals. A lead poisoned child will have limited educational and employment opportunities, and face an increased risk of a nearly impoverished life. That is the future that awaits plaintiff.

Legislative enactments and private tort doctrines offered plaintiff a path to compensation, financial stability and independence in adulthood. Those mechanisms failed here. Despite federal and state laws and private contract terms adopted to avoid dissipation of settlements at the hands of predatory companies, six judicially approved transfers resulted in the sale of more than 20 years' worth of plaintiff's settlement payments in exchange for less than 28% of their aggregate value—or less than a third of what the parties agreed he would receive. The proceeds the factoring companies received were intended to compensate a lead poisoned child for permanent cognitive impairment, not to line the pockets of a for-profit business.

The Eleventh Circuit asks us whether plaintiff has recourse under New York contract principles against those responsible for the proper disbursement of his settlement annuity payments. I conclude that the implied covenant of good faith and fair dealing encompasses a promise to disclose plaintiff's diminished mental capacity to the Florida state courts in the SSPA proceedings so that the courts could use that information to determine whether it was in his best interest to receive 30 cents on the dollar of his settlement only four years into the annuity payments.

Even that information may not have been enough for the Florida courts to withhold approval of the transfers. Theoretically, those courts may still have considered the transfers to be in plaintiff's best interest. Still, it is hard to fathom how, with a complete picture, they could reach that conclusion in light of plaintiff's allegations that the reasons proffered for the transfers lacked factual support and the fact that plaintiff did not personally appear at these proceedings in which he lost 70% of his settlement. But, then again, until today it was almost unthinkable that our legal system would so appallingly fail plaintiff Lujerio Cordero.

Following certification of a question by the United States Court of Appeals for the Eleventh Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified question, as reformulated, answered in the negative. Opinion by Judge Troutman. Chief Judge Wilson and Judges Garcia and Singas concur. Judge Rivera dissents in an opinion. Judges Cannataro and Halligan took no part.

Decided April 25, 2023